**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **STAR DESIGN GROUP, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 4:24CV620 HEA** |
| | ) |
| **SUN COAST MERCHANDISE CORP., et al.,** | ) |
| | ) |
| **Defendants** | ) |

## OPINION, MEMORANDUM AND ORDER

Plaintiff's Motion for Temporary Restraining Order, [Doc. No. 9] is now before the Court for consideration. Defendants have filed declarations in opposition to the Motion.  On May 6, 2024, the parties appeared in person for a hearing. The Court has reviewed the pleadings, exhibits, and Plaintiff's memorandum of law and the declarations submitted by the parties. The Court has considered the arguments presented at the hearing. For the reasons set forth below, the Court concludes that a Temporary Restraining Order is not warranted, and the motion will be denied.

### Facts and Background[1]

Plaintiff's Verified Complaint sets out the following:

---

[1] The Court draws the facts in this section from Plaintiff's Verified Complaint, Plaintiff's Memorandum in support of the instant motion, and Defendants' Declarations

Stars is an apparel design and manufacturing company founded in 2000. Based in Missouri, Stars maintains a network of international factories specializing in production of a diverse array of custom apparel. Stars develops apparel programs for brands and businesses and offers a full-service design staff, development and sourcing teams, and access to Stars' relationships with manufacturers in fourteen (14) countries.

Sun Coast is a direct competitor of Stars. Sun Coast, doing business as Sunscope, is a manufacturer, importer, and supplier of promotional products, including apparel.

Stars' former employees, Defendant Back, Casey Zona, Matt Hencke, Cory Watkins, Zachary Ufkes, Raven Pulliam, Revanth Karthik, Madu K G, Lijo Jose, and S. Senkottaiyan, ("Stars' Former Employees") are now employed by Sun Coast. Back was employed by Stars from September 1, 2011, to May 23, 2023, as its Senior Vice President of Merchandising/GMM (General Merchandise Manager), primarily responsible for managing all staff on Stars' pre-production teams, including decision-making authority on factory allocation, costing, quality control, production and timely delivery of Stars' products. By virtue of his employment, Back held the highest level of permissions for access to Stars' confidential information, other than Stars' CEO. Back announced his resignation from Stars on May 9, 2023, stating he planned to "retire."

2

Casey Zona ("Zona"), Stars' former Vice President of Client Integration, was primarily responsible for managing, maintaining, and growing Stars' key customer accounts, including Staples. By virtue of her employment, Zona had access to detailed financial information including costing of Stars' products. Zona prepared costing analysis, which was provided to Back, and designed to maximize profitability for Stars yet meet its clients' goals. Zona resigned from Stars simultaneously with Back, on May 9, 2023. Upon leaving Stars on May 23, 2023, both Back and Zona immediately went to work for Sun Coast.

Raven Pulliam ("Pulliam"), Stars' former Merchandiser, resigned from Stars approximately one week after Back and Zona. Pulliam now works for Sun Coast. Revanth Karthik ("Karthik"), Stars' former Director of Merchandising, resigned from Stars shortly thereafter in June 2023. Karthik now works for Sun Coast. Cory Watkins ("Watkins"), Stars' former Logistics Manager, resigned from his employment with Stars on August 4, 2023, and his last day at Stars was September 20, 2023. Watkins now works for Sun Coast. Matt Hencke ("Hencke"), who was in sales at Stars and also sits on its board of directors, never gave notice of his resignation from Stars but now works for Sun Coast.

Back, in furtherance of his employment with Sun Coast and for its benefit, recruited Stars' Former Employees in the United States and India in order to steal the Staples business, as well as other customers, from Stars.

3

Plaintiff claims Back, Stars' Former Employees and their new employer, Sun Coast, now do business with Staples and other former customers of Stars including Milwaukee Tool, BRP, Allison Putnam and Supermex (collectively Stars' "Former Customers"). The loss of business to Stars, and corresponding unjust enrichment to Sun Coast, by virtue of the wrongful diversion of Stars' Former Customers to Sun Coast is approximately Ten Million Dollars ($10,000,000.00) in revenue annually.

In the course of its businesses, Stars developed, generated, and maintained substantial confidential and proprietary information, including trade secrets, which are critical to maintaining Stars' competitive edge over other enterprises not in possession of such information. Stars' Trade Secrets are not generally known to, or readily ascertainable through proper means, by individuals or entities outside of Stars. Stars has invested significant time, effort, and expense in establishing and developing their Trade Secrets, and in developing valuable and extensive goodwill and long-standing lucrative contacts and business relationships with Stars' customers through the use of such Trade Secrets. Stars derives an economic benefit from its Trade Secrets not being readily known or ascertainable through proper means by persons outside of the Stars organization.

Stars devotes significant efforts and resources to protecting its Trade Secrets from unauthorized possession, use, or disclosure. Among other precautions, Stars: (1) restricts access to such information to those employees with a need to know;

4

(2) requires any sharing of such information to be via email to those employees with a need to know or via shared folders with appropriate permission levels; and (3) uses password-protected computers, servers, and cloud software to store and safeguard such information.

Stars also specifically protects its Trade Secrets by requiring its customers to purchase product specifications for custom apparel produced by Stars. Stars' products are produced using individually created technical product specifications ("Tech Packs") which are 20–30-page documents unique to each garment designed by Stars. Stars' Tech Packs contain detailed instructions for the manufacture of its products including information regarding sizing, fit, materials, colors, designs, and artwork. Tech Packs are complicated and time consuming to create and no universal standard or template is used.

Stars uses "Be Product" software for development of its Tech Packs. Access to the Be Product software is password protected and Stars' employees are only provided with passwords on a need-to-know basis. The Be Product software generates unique Stars' style codes, specific to each Stars designed product, which are included on Stars' Tech Packs. Only if Stars receives a purchase order, or other written agreement for a garment, does Stars' purchasing customer obtain rights to the Tech Pack for that specific garment. A customer that does not issue a purchase order, or does not pay for the Tech Pack, has no rights in Stars' Tech Packs.

In addition to requiring a purchase order for the transfer of ownership of its Tech Packs, Stars protects its Trade Secrets by establishing policies and procedures in its Employee Handbook. Stars' Former Employees received and acknowledged the policies and procedures contained in Stars' Employee Handbook. The Employee Handbook contained the following related to the Disclosure and or Use of Confidential Information:

> In the normal course of business, employees may be given or may acquire information about the business of STARS, its affiliates, its clients, and its employees that is not available to the general public. This information is confidential and is considered the exclusive property of STARS. The term "confidential information" includes, but is not limited to, financial data, business plans and strategies, artwork, technical renderings, "know-how" product [and] client lists, computer software programs, and employee Information. All employees are responsible for respecting and maintaining the confidential nature of such information.

> Upon separation of employment for any reason, all confidential information must remain in the possession of STARS, and all employees are to return to STARS all originals and copies of such confidential information.
> If an employee has any questions about whether information is confidential, he or she should contact a member of management. This policy is not intended to supersede or modify any written agreements employees have entered into with the organization to protect confidential property or information.

By virtue of his employment with Stars, Back had access to Stars' Trade Secrets, including but not limited to Tech Packs, customer lists, customer contact information, marketing strategies, product information, customized product development, designs, costing, internal pricing structures and pricing strategies that are not shared with customers.

6

Stars' Trade Secrets derive economic value from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from their disclosure or use and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

In the course of its work for customers, Stars creates and designs artwork ("Stars' Artwork") for its custom apparel. Stars' Artwork incorporates design elements which can be perceived as works of art separate from the clothing items themselves and which qualify as protectable pictorial, graphic or sculptural works when fixed in a tangible medium of expression. The Stars' Artwork is created by Stars' employees and, subject to an express written agreement to the contrary, all right, title and interest in and to the Stars Artwork is owned by Stars, including all rights protected under the U.S. Copyright Act of 1976, 17 U.S.C. § 501 et seq.

The U.S. Copyright Office has granted Registration Number Vau 1-524-364 with an effective date of April 24, 2024, for three specific designs that are examples of the Stars' Artwork. As the owner of the copyright in and to the Stars Artwork, Stars has the exclusive right to reproduce, distribute, display, and prepare derivative works based upon the Stars Artwork. Only if Stars receives a purchase order or other written agreement for a garment that incorporates Stars Artwork, does Stars' purchasing customer obtain any rights to the Stars Artwork. A customer

7

that didn't issue a purchase order, or didn't pay for the Stars Artwork, has no rights in the Stars Artwork.

The ownership of the Stars Artwork, Trade Secrets and other intellectual property is confirmed by a 2009 supplier agreement between Stars and Staples. Pursuant to paragraph 4 of the Staples Terms and Conditions, Staples, and Stars agreed that "[a]ll material or information produced and ideas or processes conceived or developed by [Stars] under a purchase order for custom orders submitted by [Staples], including, without limitation, designs, adaptations, documentation, inventions, concepts, methods, and techniques are "works for hire'" and all related copyrights, trade secrets and other intellectual property is "owned and/or authorized solely by [Staples] and /or its customers." The existence of the Staples Terms and Conditions confirms that all Stars' Artwork and other intellectual property, including Tech Packs, is owned by Stars absent a purchase order or other written agreement to the contrary.

By virtue of his employment with Stars, Back had access to Stars' Trade Secrets and other intellectual property, including Stars' Artwork and Tech Packs. Unbeknownst to Stars, Stars contends Back, during his employment with Stars, began plans to wrongfully compete against Stars and steal its Trade Secrets, intellectual property, and other confidential and proprietary information for the benefit of his new employer, Sun Coast.

8

Plaintiff avers in its Verified Complaint that Back emailed trade secret documents to his personal email from his work email prior to his departure from Stars. The documents contain Stars' Trade Secrets and information such as total sales on accounts, margin percentage on accounts, gross profits on accounts, and overhead allocation, i.e., the exact information needed to compete against Stars and attempt to undercut them on price with customers. There was no legitimate business purpose for Back to access and/or send the emails containing Trade Secrets to his personal email account.

At the conclusion of his employment with Stars, and despite demand, Back failed and refused to return his Stars issued laptop computer, which contained Trade Secrets, Tech Packs, Stars' Artwork, and other intellectual property and had access to Stars' systems. Back is still in possession of his Stars issued laptop computer and the Trade Secrets, Tech Packs, Stars Artwork, and other confidential and proprietary information contained therein. Despite demand, Back has failed and refused to return Stars' laptop issued to Back.

Plaintiff believes Back continues to have access all Stars' information.

Over the course of many years, Staples purchased Snap-On Tools branded products from Stars, some of which incorporated Stars' Artwork. Staples then sold these products to Snap-On. Stars' relationship with Staples resulted in approximately seven million dollars ($7,000,000) in annual revenue.

9

As early as July 2022, Stars was working with Staples employee, Mendoza, Staples' Strategic Account Manager, regarding the design and procurement of Snap-On promotional hoodies. Stars produced Tech Packs and Stars' Artwork for Snap On branded hoodies that incorporated car, truck and motorcycle designs protected by copyright law, owned by Stars and for which Registration Number Vau 1-524-364 as depicted in Exhibit B hereto was issued by the U.S. Copyright Office ("Vehicle Graphic Hoodies"). These designs constituted Stars' Artwork and all right, title, and interest in and to said designs, including all copyright interests, are owned exclusively by Stars.

Stars provided the Tech Packs and Stars' Artwork to Mendoza with the understanding that Staples would purchase the Vehicle Graphic Hoodies from Stars. Stars provided pricing information to Mendoza and sought her approval so that the Vehicle Graphic Hoodies could be ordered for sampling. Mendoza provided her approval, and the Vehicle Graphic Hoodie samples were sent to her Staples home office located at 125 Huntington Park, St. Charles, Missouri 63301.

In February 2023, Zona requested a purchase order from Mendoza for the Vehicle Graphic Hoodies. Staples did not furnish a purchase order.

On March 3, 2023, Back downloaded the Tech Pack for the Vehicle Graphic

Hoodies from Stars' password protected server and emailed the material from Stars email system to his personal email. Stars' Vehicle Graphic Hoodie Tech Pack contained the following information:

      a. Style Name (Vehicle Graphic Hoodie);
      b. Style Number (SNF23KT0171) generated from Stars' Be Product software;
      c. Color Name (Grape Leaf, Tornado, Kangaroo), and
      d. Stars' Artwork for the Vehicle Graphic Hoodies.

In April 2023, while Back, Zona and Karthick were employed by Stars, its competitor, Sun Coast, issued purchase order number 04/23/40354 to Stars' factory partner for the manufacture and delivery of the Vehicle Graphic Hoodies. Sun Coast has admitted that Staples provided it with the sample Vehicle Graphic Hoodies developed by Stars and that those garments incorporate the Stars' Artwork. However, it is clear from the International Bill of Lading for shipment of the Vehicle Graphic Hoodies that Sun Coast was also provided Stars' Vehicle Graphic Hoodie Tech Pack. The Bill of Lading for the Vehicle Graphic Hoodies references the identical style name (Vehicle Graphic Hoodie); unique internal Style Number (SNF23KT0171) and color names (Grape Leaf, Tornado, Kangaroo) as contained on the Stars' Tech Pack.

Although Sun Coast and Staples were aware that Stars developed the Vehicle

Graphic Hoodies– from art and technical design to fabrication and delivery of samples to Staples - Stars never received a purchase order from Staples for the Snap-On Vehicle Graphic Hoodies.

Plaintiff believes Staples and/or Back reproduced the Stars' Artwork incorporated in the Vehicle Graphic Hoodies and distributed the Stars' Artwork and Vehicle Graphic Hoodie Tech Pack to Sun Coast.

While Back was still employed by Stars, Staples purchased the identical Snap-On Vehicle Graphic Hoodies through Sun Coast. The Vehicle Graphic Hoodies were purchased by Staples, through Sun Coast, with direct knowledge that they were developed using Stars' Artwork, graphics, and Tech Packs. Staples then further disseminated these materials to Snap On, earning revenue for its sale of Stars generated products purchased from Sun Coast.

Plaintiff believes similar misconduct has occurred with respect to Stars' designed Snap-On jackets. On March 2, 2023, Back forwarded to his personal email address, detailed material and fabric specifications and pricing for a Snap-On jacket program developed by Stars (the "Jackets"). According to Plaintiff, shortly thereafter, on May 18, 2023 (prior to the Former Employees departure from Stars, but after their resignation), Mendoza along with Staples employees Theresa Vail, Courtney Scott, Thomas Goddard, and Stuart Wright had a meeting with Stars' employees, including Back, to discuss the Jackets. However, in November 2023,

just a few days before Thanksgiving Staples informed Stars that it had voluntarily terminated their contract.

On January 29, 2024, Staples Global Project and Solutions Manager, Ruiping Ramboldt, emailed Back at jeffb@sunscopeusa.com regarding "2023 Snap-On Jacket Post Mortem – Action Items from the meeting – Need Your Feedback" ("Staples Jacket Correspondence"). The Staples Jacket Correspondence inadvertently copied Stars' former employee, Cory Watkins, at his Stars email address. The Staples Jacket Correspondence definitively establishes that Staples is now working with Sun Coast to produce the Jackets. Back responded to Staples' Jacket Correspondence and reminded them to be "triple careful" not to include anyone from Stars on their emails.

On February 7, 2024, Staples again inadvertently copied Watkins (at his Stars' email) on correspondence with the subject "2024 Snap-on Jackets Planning – Tomorrow's Call & Delivery Schedule" requesting delivery of the Jackets in July and August 2024.

Plaintiff asserts Back and Sun Coast knowingly used, are using, and intend to continue to use Stars' Trade Secrets, Stars' Artwork, and its confidential and proprietary business information to improperly compete against Stars, including but not limited to selling the Vehicle Graphic Hoodies and Jackets to Staples.

Plaintiff claims Staples knowingly used, is using, and intends to continue to use Stars' Trade Secrets, Stars' Artwork, and its confidential and proprietary business information to enrich itself at Stars expense, including but not limited to procuring the Vehicle Graphic Hoodies and Jackets from Sun Coast and re-selling them to Snap-On.

But for Back's employment with Stars, Back would not have any information related to Stars' work on behalf of Staples, Staples needs for the Vehicle Graphic Hoodies or Jackets, or the knowledge and relationships with factories to service the Staples business.

Plaintiff believes the Jackets are currently in production by Stars' factory partners overseas and, as with the Vehicle Graphic Hoodies, Sun Coast intends to sell the Jackets to Staples who will, in turn, sell the Jackets to Snap-On.

According to Plaintiff, because Back misappropriated Stars' Trade Secrets including detailed costing, pricing, and margins information, he is now in a position to undercut Stars on pricing through his employment at Sun Coast.

Back, Sun Coast and Staples have submitted declarations wherein they deny using any of Plaintiff's trade secrets. In his declaration, Back declares he emailed the information to his personal email for the purpose of using it for purposes of his employment with Stars. He further declares Plaintiff never requested the Stars

14

laptop from him, that he had the laptop wiped to its original factory settings and gifted the laptop to his son.

Sun Coast's Chief Operating Officer, Dilip K. Bhavnani filed a declaration in which he declared Sun Coast has a preexisting relationship with Staples and that the 2024 Snap-On jackets were designed independently by the design staff at Sun Coast. Significantly, Mr. Bhavnani declared that none of the materials claimed to have been taken by Defendant Back were ever shared with him or Sun Coast. He further declares that he is responsible for pricing and contract terms, and nothing related to Stars Design has ever been used by him in that context.

William Gossman, Vice President of Customer Experience at Staples Promotional Products, submitted a declaration. In his declaration, Mr. Gossman declares that Staples Promotional Products owns the designs, concepts, and intellectual property in the jackets Stars designed in 2021, 2022, and 2023. He further declares he has no reason to believe the Sun Coast proposal is based on the Stars proposal.

### Legal Standard

The standard for issuance of the "extraordinary and drastic remedy" of a temporary restraining order or a preliminary injunction is very high, *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and by now very well established. Whether a preliminary injunction should issue involves consideration of (1) the

threat of irreparable harm to the movant, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits, and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). The same factors govern a request for a temporary restraining order. *Roberts v. Davis*, 2011 WL 6217937, at *1 (E.D. Mo. Dec. 14, 2011). The movant bears the burden of establishing its propriety. The moving party bears the burden to establish the need for injunctive relief. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914 (8th Cir. 2015); *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (citation omitted); *Chisano v. Newton*, No. 4:23-CV-3133, 2024 WL 2092000, at *2 (D. Neb. May 9, 2024). None of the four factors "is determinative," and each must be examined "in the context of the relative injuries to the parties and the public." *Dataphase*, 640 F.2d at 113. "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id*.

**Likelihood of Success on the Merits**

The likelihood of success is the most important factor. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). This factor directs courts to ask whether the party requesting a temporary restraining order has a "fair

chance of prevailing." *Planned Parenthood Minn., N. Dak., S. Dak. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).

To demonstrate a likelihood of success on the merits, a movant need not show that it will ultimately succeed on its claims; rather, it must show that its prospect for success is sufficiently likely to support the kind of relief it requests. *Noodles Dev., LP v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030, 1034 (E.D. Mo. 2007) (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir. 1993)). That is, a movant need only show that it has a "fair chance of prevailing." *Planned Parenthood Minn.*, 530 F.3d at 732–33.

In response to Plaintiff's motion for a TRO, Defendants have submitted a declaration wherein Defendants deny the claims of "theft" of trade secrets and use of any of Plaintiff's trade secrets in the production of the Snap-on jackets. Back declares he emailed Plaintiff's information solely for the purposes of his employment with Plaintiff. He claims to have had the computer reset to its factory settings and was never asked by Plaintiff to return the computer.  All the declarations contained in Back's declaration directly contradict the averments in Plaintiff's affidavit and verified complaint.  The Court cannot, at this stage, ignore or discredit Defendant over Plaintiff or vice versa. The other defendants have also submitted declarations wherein they deny any use of Plaintiff's trade secrets.

To prevail on a misappropriation claim under the Defend Trade Secrets Act ("DTSA") Plaintiff must show both the "existence and the misappropriation of a trade secret." *Wilson v. Corning, Inc.*, 171 F. Supp. 3d 869, 881 (D. Minn. 2016). "Misappropriation," means the acquisition, disclosure, or use of another's trade secrets by improper means. 18 U.S.C. § 1839(5). A "trade secret" is information that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 899 (8th Cir. 2005); see 18 U.S.C. § 1839(3). *Advantage Sales & Mktg. LLC v. McClellan*, No. CV 22-2371 (JWB/DTS), 2023 WL 9056124, at *1 (D. Minn. Nov. 14, 2023)

A claim for misappropriation of trade secrets under the MUTSA has three elements: (1) the existence of protectable trade secrets, (2) misappropriation of the trade secrets by the defendant, and (3) damages or entitlement to injunctive relief. *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 926 (E.D. Mo. 2010); *Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014) (en banc). Missouri law defines a trade secret as:

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4).

Misappropriation is defined as:

> (a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
> a. Used improper means to acquire knowledge of the trade secret; or
>
> b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or
>
> c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>
> i. Derived from or through a person who had utilized improper means to acquire it;
>
> ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Mo. Rev. Stat. § 417.453(2). *See also Secure Energy, Inc.*, 708 F. Supp. 2d at 926.

Defendant had knowledge of Plaintiff's confidential information, but under both the DTSA and the MUTSA, Plaintiff must show that Defendants misappropriated that information. At this point in the litigation, Plaintiff has made no such showing. Plaintiff asserts that Defendant Back has taken the secrets and used them in competition and has one of Plaintiff's laptops. Defendant has

submitted his declaration wherein he unequivocally declares he used the emails or Stars' business alone and that the laptop has been reset to its factory settings.

### Irreparable Harm

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). Plaintiff must show that the harm is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Gen. Motors Corp.*, 563 F.3d at 319 (citing *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)). Speculative harm does not support a preliminary injunction. *MPAY Inc.*, 970 F.3d at 1020.

There is no evidence in the record that Plaintiff has suffered irreparable harm or that such harm is certain and imminent. Plaintiff argues it has been irreparably harmed and will suffer further irreparable harm because of the theft of its trade secrets. Regarding the hoodies and T-shirts, there is no dispute they are no longer being produced. Any harm Plaintiff may be able to prove regarding the use of its trade secrets by defendants is no longer occurring; there is nothing for the Court to enjoin. Plaintiff may attempt to recover damages regarding such use, but the equitable remedy of a TRO is no longer viable.

With regard to the production of the new Snap-on jackets, the conflicting evidence in the record precludes a finding of irreparable harm to Plaintiff based on Defendants' actions.

**The Balance of Harms**

"The balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Noodles Dev.,* 507 F. Supp. 2d at 1038 (cleaned up). An illusory harm to the movant will not outweigh any actual harm to the non-movant. *Id.* (citing *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992)).

Defendants, through their declarations, argue they will suffer substantial damage if a TRO is granted; the contract with Snap-on will be breached resulting in upwards of five million dollars in damages. Plaintiff, on the other hand will suffer no apparent future harm absent a TRO since the alleged theft has already occurred and Plaintiff's customers have already ceased being Plaintiff's customers, such that money damages could compensate Plaintiff for the loss.

**Public Interest**

Finally, the evidence before the Court fails to establish that a TRO is necessary to protect the public interest. While the public also has an interest in protecting trade secrets (*see Conseco Fin. Servicing Corp. v. N. Am. Mortg.*, 2000

WL 33739340, at *12), there is insufficient evidence in the record to show that defendants have appropriated Plaintiff's confidential information through the manner Plaintiff's verified complaint claims.

## Conclusion

Having thoroughly reviewed the minimal record in this case, including pleadings, exhibits, affidavits and declarations, and arguments presented at the hearing, the Court concludes that the balance of equities does not favor the entry of a TRO. The Court has carefully considered the four *Dataphase* factors and finds Plaintiff has not established that it is likely to prevail on its claim of trade secret theft or that there is a significant threat of irreparable harm to Plaintiff absent an injunction. *Dataphase Sys.*, 640 F.2d at 113.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order, [Doc. No. 9], is **denied**.

Dated this 14th day of May,  2024.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE